Our next case for argument today is 23-1446, Focused Products Group v. Kartri Sales. Before we start the clock, can I have both Mr. Cox and Ms. Jean at the podium, please? No, I want you at the podium. You don't come to the floor. My apologies. Counsel, as I understand it in this case, you filed non-compliant briefs where you attempted to incorporate by reference each other's briefs, dividing up the arguments. One of you took on the patent arguments, the other took off trade on the trademark and trade dress arguments, and you attempted to incorporate each other's briefs by reference, which would have literally doubled your word count, leaving potentially Focus at quite a disadvantage. Our court struck your briefs as improperly filed by virtue of your attempt to incorporate them by reference and instructed you to refile. Is that correct? That is correct. And then you refiled your briefs, and your refiled briefs basically appear to continue the identical error. It's almost like an in-your-face to the court. We don't see this very often. One brief spends 40-plus pages addressing patent infringement, covering three patents, multiple different claim terms, and the other brief spends one page on patent infringement. This court has decided that we are going to ask you to show cause why the two of you should not be sanctioned for a direct violation of court rules and this court's prior order. We're going to ask you to file briefs within 10 days, both of you independently, on why you should not be violating the court's order, and if you should be sanctioned, or if we choose to sanction you, what an appropriate sanction would be, up to and including the possibility of your client's forfeiture of all of the arguments that you failed to properly develop and address in your briefs. So we're going to begin our argument that way. You're not going to need to spend your time on that. We'll address the merits. But within 10 days, limited to 10 pages, double-spaced, we would like briefs from each of you on why you should not be sanctioned as attorneys and members of this court's bar. Okay, Mr. Cox, you may go back, and now we'll hear argument on the merits. Thank you, Your Honor. May it please the Court, I'm Patree Jean, representing Cartree Sales Co. Inc. I respectfully submit on behalf of this Court that it should vacate the appealed orders, including the December 22nd order, the summary judgment of non-functionality and attorneys' fees. It should dismiss or transfer this case, and once and for all hold that the trade dress, the unregistered trade dress in this case, is invalid as a matter of law. This case is about parties that have been involved in the shower curtain business for many years. My client, Cartree, is run by two hardworking women who have been in this industry for almost all of their lives. Fifty years ago, their father, Michael Koskowski, opened Cartree and named it after his daughters, Karen and Trish. Cartree is now run by those same two women, and this case is about shower curtain patents, design patents, and trademarks that are related to shower curtain technology. Which issue do you want to focus on first, hopeless, easy on, or the trade dress? I think we'd like to focus on the trade dress first, because we do believe that the trade dress is invalid as a matter of law, specifically because it is dysfunctional. Is that a question of fact or a question of law? I believe that in this case it is a question of law, because there have been two tribunals that have decided that this case, that the trade dress is functional. Once in the Maytax case, that was decided in May 26th of 2021, and then second at the USPTO. First time around, that first opinion was a preliminary injunction decision, right? It was a preliminary injunction. And then it ultimately got vacated, right? And ultimately it was vacated, that is correct. It was vacated two years pretty much after it was finalized. There was no final judgment on the validity, that is correct, Your Honor. So it's not much support, correct? I'm sorry, Your Honor? That's not much support for your argument. Doesn't constitute a holding, it wasn't a ruling. It wasn't a ruling, but the judge... It was vacated. That is correct, Your Honor, but the judge went through a very detailed analysis on why it was functional. You won't get very far relying on vacated opinions. Okay. The best you could do is indicate what persuasive value its reasoning actually provided, and I didn't see your briefing actually walk us through that, you know, now vacated district court opinion on that. Yes, but what it also mentioned was the fact that Zahner has now filed a trademark application in order to register the unregistered trade dress, and there's now a non-final office action that held that the, well, that found that the trade dress, unregistered trade dress was... Okay, if I think that the district court judge didn't apply the correct law on functionality and genericism, what is the result? If you found that they didn't apply the correct law, then you need to basically look, de novo, is the standard here, because it was decided on summary judgment, at the issues on how, whether or not it is functional. Wait, you think I decide fact questions? No, it's... On appeal? Functionality is a question of fact. Okay. I think we would have to vacate and remand. You would have to vacate and remand. Construct the district court to consider the functionality question under all the requirements provided in traffic's opinion. That's right. Yes, and under the Morton Norwich factors. In traffic's, as I recall, utility patent is strong evidence. It's very strong evidence. It's number one. Certain trade dress features, and obviously by referring to it as strong evidence, that makes it more and more sound like it is a fact question. It's not a pure legal question. It's not a pure legal question, and I think that that is correct, but if you take a look at some of the evidence that was elicited at trial, like for instance, I think it's on appendix page number four, one to five. There, during Mr. Kent's cross, when they were talking about whether or not Zahner believed that they would continue their intellectual property rights coverage over the trade dress, even after the 232 patent had expired, he said yes, that it would, because they didn't expect that anyone would do, make any copies of it, because it would continue to be, the trade dress would continue to be covered by the trade dress. Now, do you intend to set any time for rebuttal? Because this is all your time right here. Thank you, Your Honor. If we have, if I'm provided a chance for rebuttal, I would appreciate it, but if not, then I submit on my own. Thank you very much. I may have pleased the court, Your Honor. My name is Donald Cox. I'm here on behalf of Markey Mills International, Inc. I was going to speak briefly today on the issues of the EZON mark, the trade dress, and the three patents. With respect to the EZON mark, it was our position that they had not shown standing by way of showing that they had good will at the time that they filed the complaint. This was evidenced by the fact that EZON, at that time, was being sold exclusively by Carnation. Carnation was a licensee of E. Appelese, and they had used the mark prior to becoming a licensee. Did Carnation own the mark? They filed a federal registration claiming ownership of the mark in 2017, and claimed it under that federal registration. There was never an assignment that was produced prior to this litigation showing that Appelese had acquired ownership of that mark. Wasn't the dispute all over just one clause or one phrase in the Carnation contract and the question about whether or not that demonstrates who owns it? Yes. So why don't you stand up and tell us why that interpretation was wrong? The interpretation, it was a right to use clause 4.2 in the Carnation license agreement, and it's Appelene's position that that particular clause was just granting them the right to use it on their patented licensed products. There's no indication in there that there was an assignment. There was no indication that goodwill was transferred as a result of the assignment, and it ran counter to sections 1.7 to 1.9 where the license agreement defined what the licensed IP was. Okay. Your accused products here, whether it's trademark trade dress infringement, patent infringement, are all of your accused products what I'll call D-shaped rings? Yes, sir. I.e. a purely flat upper edge? Yes. Okay. Do you want to say something about patent infringement? Your remaining 90 seconds? Right. We believe with regard to the 248 patent that when the actual Markman order is followed, level or nearly so, our 22 degree slope is too steep to be covered by that special requirement. With regard to the 609 patent, we believe that the space of portion of a flat upper edge that extends between the slit and what is defined as the projecting edge doesn't meet the limitation that the projecting edge is adjacent to the slit. And finally, in the 088, we believe that an entirely flat upper edge due to prosecution history and the specification that the entirely flat upper edge is not covered by a patent with a projecting edge and a flat edge. I thought the 088 clearly covered flat product. It includes a claim limitation, your honor, for a flat upper edge, but during the prosecution there was a claim 12 that had a projecting edge and it was held to be indefinite and the entirely flat upper edge element that was shown in figure 21 was found, was argued by them to only be in figure one. When claim 12 with the projecting edge was then amended later into claim one, it's our position that they then surrendered the claim scope for an entirely flat upper edge. Well, what do you do with a summary judgment on the 088 infringed because the accused device and the photograph that Fokus used met the limitation of the projecting edge from the outer circumference? That's the infringement of that patent, right? A ground for infringement. That's the ground for, I believe, it could be said for that patent as well as the 609, don't you have to address that specific finding and tell me why it's incorrect? It's incorrect, your honor, because that particular projecting edge actually cannibalizes the ring itself. It's not showing a projecting edge that is projecting from the outer circumference. It's actually cannibalizing part of the outer circumference. That raises the question of what the outer circumference in the accused product is, correct? Correct. What is, in your view, what is the outer circumference? Well, the outer circumference in the claim requires that it... Did you bring a copy of the exhibit four, I believe it is, that was put in the trial, which shows the picture of the accused product? You don't have that in your hand? I don't have it readily at hand, but I can tell you... To make his decision that the accused product met the projecting edge limitation?  Okay. Now, I also want to point out that in the demarkment and also in the summary judgment that prosecution history, he used a standard that he took from Plantronics, which was a disavow standard that indicated that any limitations that were surrendered by an amendment had to also have an express disavow in order to... Where is the express disavow with regard to projecting edge? Well, it goes back to the amendment as to whether or not an entirely flat upper edge was covered by the 088 patent. Are you trying to argue that the 088 patent doesn't read on a flat edge? When the flat edge is the entire upper edge, Your Honor, yes. I know I have 19 seconds left of my time. You're not helping me because it looked to me like the only way that the district court judge could have found that the projecting edge limitation was met was by looking at your drawing that your adversary put in and to say that the outer circumference doesn't include the straight walls that go up. That the outer circumference only includes the lower curved portion. Because if the outer edge, outer circumference includes the portions that go all the way up, then there's nothing projecting from that edge. And that is our possession that that includes all of that. And I mean, I'm stating that you can nowhere find that articulation anywhere in your briefs. What I just said. Right? So the judge must have made that impression. So I'm asking you, where do you believe the outer circumference is in the accused product? In the accused product, the outer circumference includes the entire region that is not the flat upper edge on the outside of the room. Doesn't the outer circumference have to go entirely around the entire ring? Doesn't the claim require... The specification differentiates between what is outer circumference and what is flat upper edge. But the claim language says a ring comprising an outer circumference. Right? Yes. Does that mean that the outer circumference has to go around the ring? We argued that in the markment. The judge didn't find that. What do you mean the judge didn't find it? He didn't find that the outer circumference had to go around the entire ring. Where did he say that? He said that the outer circumference is rounded at least in part, curved at least in part. Right. Why does that mean it doesn't have to go around the ring? We're in the markment hearing. Did he say that the outer circumference doesn't have to circumscribe the ring? I'm out of time on that. I can't pull that up per se right now. Okay. Thank you, Mr. Cox. Let's hear from... Maybe you can answer the question when you get up on the rebuttal. Mr. Cullen? May it please the court. When the defendants moved for summary judgment on the issue of functionality, they did not provide the district court... Counsel, I'd like you to start with the rings argument.  Which argument would you like me to deal with the patent argument on the rings? Flat top. Sure. If we look at the patent prosecution history, for example, if we take a look at Appendix 1192 to 1193 and we look at Appendix 1202, in the prosecution of the 08A patent, the patentee specifically explained that the claims cover a flat upper edge and it also explained that it covers... I think the problem is the 248, right? Oh, I thought you said the rings. Excuse me. You want me to go 248 rings? Yes.  Whether the 248 covers rings with flat tops. So the 248 ring language is not specific. It doesn't cover any particular type of ring. It covers all types of rings. And when they argued this below in the claim chart, they did not limit the term ring to a ring that had to have a non-flat upper edge. They recognized that the patent itself... At 855-57, it appears that the district court did wrestle with this prosecution history disclaimer question. And I believe at 857 specifically said, I conclude there was no disavowal of a flat upper edge in this prosecution history. Correct, Your Honor. Okay. So this was evaluated and in fact, it was then presented in their summary judgment briefing. I think it's at 2407-08. So now the next question is walking through this prosecution history where the examiner first issued a restriction, you know, and designated different figures as corresponding to different species. And then demanding the applicant to elect one of the nine species. And then the applicant selected species four. And then added some claims. And in that addition of new claims presented dependent claim 73, which says, you know, claim 61, wherein the ring has a flat upper edge. And then that received an office action from the examiner saying, no, you can't have that claim because, you know, that claim is directed to a non-elected species. I'm withdrawing that claim. And then in response, I don't believe the applicant said anything about that. And then an ultimate final action notice of allowability, the examiner said, okay, this claim 73 is canceled. And if you, applicant, have any objections to this, you can file an amendment. But, you know, this doesn't correspond to the subject matter that's been elected. And then, of course, we get to the 088 prosecution, where, again, the examiner repeated himself saying, okay, these claims are okay once you amended them, because they do not call, because they recite a flat upper edge, which is subject matter that was not claimed in the prior patents, i.e., the 248609. So when we look at the prosecution history, it seems to present a fairly, not fairly, a consistent and clear picture of an examiner trying to police the applicant to make sure certain subject matter gets claimed in one application versus another application. 088, the examiner says, yes, on flat upper edge. 248609, the examiner says, no, no, on flat upper edge. And I guess what I'm wondering, then, is why, is that a misunderstanding of the thrust of what's going on here? Yes, I would say so, Your Honor, for a few reasons. One, under Plantronics, an ambiguous restriction requirement cannot be used to limit the scope of the claim. I agree. And if this particular fact pattern had been nothing more than the restriction where species were identified to different figures of the application, and then the applicant identifies one species, and we didn't have anything more without any further explication of what these different figures represented as the species, then we would be in Plantronics' world, and I would agree with you. However, we have more. In fact, we have a lot more of a story developed here, which was a story that Plantronics did not have. And that is why, in Plantronics, I think we correctly concluded that there wasn't enough of a clear story. So, I understand that. I would say that there needs to be an express disavowal, and the examiner also required the withdrawal of Claim 88. Claim 88 has the ring extending above the hem, but yet that's part of Figure 4. I mean, Species 4, excuse me. If we look at 18, 19, and 20, there are numerous embodiments in which the ring extends above the hem, and yet the examiner withdrew it. So, it just shows that there were ambiguities, and we don't know what was going through the examiner's mind. We can't use his withdrawal of a claim as a basis to find an express disavowal when his withdrawal of a claim is, in fact, contradictory to Species 4 itself. The rings clearly are above the embodiments. The concern I have there is that we can see that the examiner was taking every reasonable step possible to police the boundaries of these applications, and trying to funnel and channel different subject matter into different applications. And then in the 088, it permitted that one to go forward without a double patent rejection because that application recited the flat upper edge. And so, what... And the applicant didn't say anything about that. And so, if the applicant moves forward under these kinds of circumstances, it seems a little strange to let the patent owner all of a sudden say, well, guess what? The 248 also encompasses a flat upper edge. I mean, it would seem to completely destroy everything that the examiner was saying and communicating to you about how to understand what the nature of these different patents were. Well, I would note a few things. The 248 is infringed because of the issue of the approximately horizontal component. And the 088... Yeah, and that's part of the problem here. The district court only looked at that issue, the approximately horizontal component. And we don't have the district court really facing down this prosecution history problem, at least not directly when it is looking at this particular infringement question. Because as the district court noted at Appendix 92, they didn't raise the issue as to the 248 patent that Your Honor is raising on summary judgment. We provided claim charts with all of the claim elements, all of the limitations, and compared it, as Your Honor noted. And those claim charts had the limitations that could have contested them on summary judgment. On approximately horizontal, do you think when drawings are not drawn to scale in a patent that it's appropriate to take out a protractor and start measuring angles on the way different lines in that not to scale drawing intersect? So I think that it depends on the circumstances. Here, the specification specifically says that this particular component is approximately horizontal. If we compare that drawing to their product, that drawing is, their product is closer to horizontal. So clearly we have to look at what the patentee intended. If the patentee intended that that particular illustration was approximately horizontal, their product, which is closer to horizontal, must be within the scope of the claim. But I just don't know of any case where we have endorsed as evidence taking a not to scale patent drawing and then trying to, I don't know, measure a particular angle in the figure. I mean, it seems, unless the patent specifically indicates, yes, these drawings are drawn to scale. I mean, otherwise, these illustrations are just conceptual illustrations. Well, I'm not sure of that. This is the intrinsic evidence. But do you know a case that says, yes, we can go ahead and take out the protractor and start actually measuring these things? I think in Vasquez versus Muhorkar, the court said that it was a question of fact as to whether there were support based upon whether one could infer from one patent, from a design patent to a utility patent, based upon the ratios of the products. So even though the court didn't say about a protractor, it didn't indicate that you could look at the drawings and get an inference as to a question of fact as to ratios and so forth. Is it right that all of the accused products here have a purely flat upper edge? I'm not sure what you mean by right. Are there other accused products by you? Oh, I understand the question. That don't have a flat, purely flat upper edge? All the accused products have a flat upper edge. OK. Which falls clearly within 08-8. And they didn't dispute it on summary judgment. You have a figure 21 in your patent. Yes, that's correct. And it has a purely flat upper edge. That's correct. Does figure 21 have a projecting edge that projects from the outer circumference? If I may look at the figure, this edge projects from the outer circumference. The edge on the side. We claim that to be a projecting edge. The outer circumference... When you say you claim, the patent doesn't say one whit about that portion of the side edge of figure 21 being a projecting edge, right? Well, the patent merely refers to it as an edge... I just need a yes or no question. There is no... There's nothing in the specification that tells us that the patent owner believes that those pieces that you're pointing to now are projecting edges. And you're talking about in... Figure 21. The patent doesn't refer to figure 21, but it refers to it as an edge which projects from the circumference in general. No, no, no, no, no, no. Now you're mixing things. Yes, I'm talking... Just focusing on figure 21. We're just focusing on what your specification says about figure 21. I understand. So we agree with each other that your patent doesn't say anything about figure 21 including a projecting edge. I don't think so. I think... Okay, I'll... We'll take it as a no. I don't think so. I think we'll take it as a no. Okay, now what about the 088 prosecution? Right, what about it? There was an opportunity there for you to identify which figures of this patent support the idea of having a claimed ring with a flat upper edge and also a projecting edge. Do you remember what figure your applicant pointed to in support of that? I think figure 21 and... No, it was figure 31B. The one time when the claim was only about a flat upper edge, you pointed to figures 21 and figures 31B. That was application claim 1. Then dependent claim 12, which depended from application claim 1, which called for now also a projecting edge, the applicant didn't point to figure 21 for support for that dependent claim. It pointed just to figure 31B. And lo and behold, when you look at 31B, of course, you can see something that's a flat upper edge. And then you could also see something that looks like a projection off of the ring. Respectfully, I don't think that's accurate. In 1202 in the prosecution history, the applicant said that claim 1 is a generic claim with respect to figures 21 and 31B. We identified 21, both of which disclose a flat upper edge. And then we talked about the projection. We say, in addition, applicant respectfully submits the specification doesn't, in fact, provide support for disclosure when one or more projections are next to the slit. We say that they're projected. And figure 31B, you don't point to figure 21. That is the concern I have, is that this applicant never thought figure 21 included a projecting edge. If it had, it would have notified the examiner right there. And it also would have notified the world in the patent specification, but it didn't do so. So the other question I have is, why isn't the entire U sidewall boundary and outer circumference here, whether it's figure 21 or the accused product? Why does the district court get to artificially proclaim that the upper part of the U shape is a projecting edge and then the lower bottom curved portion of the U get to be an outer circumference? Okay, if I can first address figure 31B, your first part. Figure 31B is very similar to the accused product. It's got a flat upper edge and then it's got the equivalent of what they have a slit on the side. It has a projection coming off of the ring in figure 31B. So you can put that to the side. We're submitting it's an equivalent, of course, but now going to the argument about projecting edge, the claim language is very broad. The claim language talks about an edge which projects from the circumference. Right, and why isn't the entire edge the outer circumference, I guess is the question. Because that would contradict the species that it's based on. If you look at 18, 19, and 20, if you make the entire circumference what they say, then there are no projecting edges anywhere in the patent. The patent talks about this being a projecting edge, this, this. If this whole thing is the outer circumference, then there is no projecting edge anywhere. The claim construction for outer circumference is what? The claim construction. It's an outer edge curved at least in part. Right. So I don't understand what the accused products ring. The entire outer edge doesn't meet that claim limitation under that construction. No, under construction, the bottom is an outer circumference and then there's a projecting edge off of that outer circumference. The outer circumference... I mean, do you have with you the drawing you presented to the judge, which I'm sure he relied on. It was exhibit four. I do have that. Do you have it? Can you open it up? We can talk about that. Yes, of course. I have it in front of me. So let's start. Does the outer circumference have to circumscribe the entire ring? It does not have to. Why not? Doesn't the claim call for a ring, right, comprising an outer circumference? Yes, it must comprise an outer circumference. It doesn't say the outer circumference has to be the entire ring. It has to be, there has to be an outer circumference, which there is, and there has to be something that projects from the outer circumference. If we define the outer... Where does the outer circumference under your drawing, where is it on the top? The outer circumference has to circumscribe, correct? Well, the outer circumference has to be at least this portion over here, and there needs to be a projection, which is this portion over here. If we define the outer circumference as circumscribing everything, then none of the figures of the patent have an outer, have a projecting edge, because if we subscribe... If it includes the entire thing, then there's no projecting edge. That's right. And that would mean that the patent, when it's talking about projecting edges, makes no sense. We can't determine... So you say the projecting edge stops, apparently, about at the point where the slit is made. Right, it starts around... Where it ceases to be curved. Yes, that's correct. That is correct. That's where the projecting edge begins, and the slit is right next to the projecting edge. But that's just your say-so. There's no reasoning why it has to be that way. It's not clear to me why you are electing to choose a certain point along a line and saying, now we can demarcate one structural element from the other structural element. Why all of a sudden, on the other side of that data point, that point on the line, we now have something called a projecting edge. You know, if this claim didn't claim a projecting edge, I'm sure you would look at the accused device and say, oh yeah, the whole thing is the outer edge. You wouldn't be saying about the accused device, oh, we have to stop as soon as the curve starts to become a straight line. That part of the boundary is now something else that's not the outer circumference. Well, our position is even consistent with Figure 31b that Your Honor mentioned. There's an outer circumference, but not the whole thing. Over here, there's a projecting edge If we called the whole thing the outer circumference, that would contradict Figure 31b. We put a lot of patent claims off of this specification. Do you have any claims that just recite a flat upper edge without also reciting a projecting edge? Not sure off the top of my head that I can think of any. Because I would have thought that would have been the type of claim that you would assert against this accused product. As fun as these edges are, could I ask just about the EZON mark real quick? Is that okay? And may I also address the trade dress if I could quickly? Go ahead. Why don't you go ahead on the trade dress? On the EZON mark, I just want to know what your response is to no standing, because I think there's an ownership problem. Okay, so in the EZON mark in 4.2, the parties recognize that our client was giving rights to this design, to this particular mark, to the defendants. It would make no sense that we're sub-licensing a particular mark if it wasn't understood that we would own it. Furthermore, in 5.3, it was made clear that all the intellectual property that was associated with this product belonged to our client. Well, in 5.3, it's forward-looking. It doesn't apply to intellectual property Carnation already owned. 5.3 is forward-looking. And if Carnation already owned this, 5.3 doesn't cover it. Well, in 4.2, it covers everything, including the back. But in 1.7 or 1.9, I can't remember, the licensed trademarks are defined. And those are for hook lists. It doesn't say anything about EZON. Except in 4.2, it says that... But you would think if this EZON was really a trademark that belonged to you, you would have identified it in the provision that says licensed trademarks. And this is what we're giving to you. 4.2 is equally likely as directed to the defendants being the ones that are using... I mean, Carnation being the one that has the rights to the EZON mark. And what you are allowing Carnation to do is to combine up the use of its EZON mark with your hook list mark on these licensed shower curtains. That sounds just as equally plausible, if not more so. Well, that's a factual question. And the president of Carnation was asked, how could it be that they were... Would it be possible that they could be granting you the mark unless they owned it? And he said, no. He recognized that. How long has your client owned the EZON mark? Since the date of the Carnation agreement in 2012. So it didn't have it before then? That is correct. It accused it. It was a problem because our client had Flexon. They had EZON. Right. And you accused... them of infringing your Flexon mark. You never before accused them of infringing the EZON mark. Well, the EZON was too close to Flexon. That's why the parties agreed, as a matter of fact, in the agreement that our client would own all these intellectual properties associated with the product, including EZON. And 5.3 reflects that. The idea going forward is the same as the idea going backwards. Isn't there a letter at some point where Carnation said, you're infringing our EZON mark? When they wanted more money for it. And then they later agreed that we owned all the rights back to 2012. Well, it's less than clear what that 2021 agreement actually means, but obviously the district court did not consider it. Well, there was an assignment and an agreement. The district court didn't consider it either, but there was both an assignment and there was an agreement which expressly said that our client owns the mark. Okay, why don't you get on to your trade dress argument since we have to wrap this up. Thank you, I appreciate it. So when it came to trade dress, it's important to note that the defendants did not cite any admissible evidence on summary judgment in support of their functionality position. The court on 126 specifically denied their motion because of this. And we can confirm this by looking at one page, appendix 2440. 2440 is their entire argument on functionality. That and a footnote on 2433. 2440 does not have any of the positions that they're making on appeal. It had no admissible evidence. To give you the background, we filed a motion for summary judgment of non-functionality. We cited two experts that both said that the trade dress was non-functional. They filed a cross motion and response at 2440. They did not rebut our experts. They did not put in a single word of factual testimony. They did not put in a single word of expert testimony. They didn't cite any of the cases that they're relying upon here today. They didn't rely upon any of it. And I have a copy of that page, if your honors would like. Now on appeal, they're taking positions that they never took below and it contradicts the positions below and it can't meet the high appellate standard of review. This is a question of fact and yet they're making arguments as if this was de novo. If we look at their 2440, none of the arguments that they're making traffics or otherwise are there. Their only case that they cite there is Uriman, which has nothing to do with the matters here. Uriman had to do with the precision of the trade dress. If you look at the arguments they're making now on appeal, there are three possible standards that can be used for functionality. Something is essential to the use of purpose, something affects the cost or quality, or something provides a significant non-reputation related disadvantage. Notably, the arguments they make now contradict the arguments they made below. Below, they conceded essential and they conceded affects cost quality. They didn't argue those at all. The only thing they argued was non-reputation related disadvantage at 2440. On appeal... What about 3406-07? 3406-07? That's after summary judgment. Gray brief points this out. Yeah, their briefs point out materials after summary judgment. Their opening brief does not have any of these arguments. They, unfortunately, misleadingly reply... Was the trade dress intention decided at summary judgment or at trial? Functionality was decided on summary judgment. And the reply brief at 7 cites the documents from three years later at trial as their alleged evidence, as they do when they're opening brief. They're citing alleged evidence that was from three years later at trial that was never brought up on summary judgment. They're citing to materials from a SIR reply to which we had no opportunity to respond. And this is a factual question. And the district court's decision on factual questions under the Second Circuit in Vasquez v. Azoulay, 834 Federal Appendix 654 is reviewed for clear error. A district court's factual findings on summary judgment are reviewed for clear error. There's no clear error here. Factual findings on summary judgment?  That's what Vasquez says. If it's a decision of law, then it's reviewed for de novo. But Vasquez says that if it's a factual finding on summary judgment... You can't make fact findings on summary judgment. This is what the Second Circuit said in Vasquez. And that if there are nondisputed material facts, which there are here... What's the standard for summary judgment? The summary judgment is generally de novo. No, no genuine issue of material fact. Can't grant summary judgment, right? Right. And here there was no disputed issues of fact. They didn't dispute any of the facts that we put in and they didn't put any facts of their own. That's why... Where is the summary judgment ruling on functionality? Yes, it's appendix 126. 125 to 126. The point when the district court says that there's no admissible evidence is 126. That's correct. That's on summary judgment. That's on summary judgment. That's correct. Thank you, counsel. Thank you, Your Honor. So we went over. So we're going to reinstate some of your rebuttal time. I think Ms. Cox or Ms. Jean still had two minutes, right? Beforehand. So why don't you give her her whole five minutes? And then we'll reinstate Mr. Cox's four minutes. Just from the last issue that we were talking about in the reply brief in support of defense's motion for summary judgment, which is at appendix page 2837. And we cite page 2851 from that reply brief where we talk about the district     and whether it is non-functional. So whether it's being functional. We didn't specifically talk about the tracks case in that case. I think we talked about a case that was Value Engineering, Inc. The Rexner, which. Where's the discussion on functionality in that document, 2837? 2837 is just the front page of it. Oh, I see that. Uh-huh. But if you go to the bottom of page 10, which is 2850. These patents are evidence of the functionality of the design. But plaintiffs have made no effort to differentiate their trade dress elements from these patents. And once product feature is found to be functional based on considerations, there is no need to consider the availability of other designs or shower curtains. Cites to Value Engineering. And it says alternative designs do not make a functional design into a non-functional one. Well, the extent of your argument is like six lines. Right? In this reply brief. Starting these utility patents are in evidence and running through the first two lines of the next page. Uh, yes, Your Honor. That's your entire argument to the judge in rebuttal on the summary judgment? In the reply brief, yes, Your Honor. Uh, opposing counsel said the district court found that you introduced no evidence at all on this point. Is that correct? Uh, I don't think that that is correct. We did, uh, point to graphics in another brief. I mean, I know that, um, in terms of, um, when, uh, everyone's preparing for trial, there was a, uh, motion in lemonade that was, um, that was, uh, filed by... Can you point to evidence? Yes, Your Honor. The allegation from the adviser was that you gave no evidence? Yes. And we cite to these in our brief as well. On page six of our brief, uh, and we cite to, uh, pages... Page six of your brief or the other part of your brief? Of our reply brief, and we cite to... Of your reply brief in this case? In this case. The reply brief? Yes. The reply... The appendix pages where we cite to the evidence are appendix pages 3406 to 3407. And I mentioned to you just now before, pages 2850 through 2851. 2850 to 51 is what you just cited. Is what I just cited, yes. And that's not evidence, right? And then 30... Excuse me? That's not evidence? Well, we mentioned that the patents are strong evidence of functionality. So I would say that that is evidence, Your Honor. And then 3406-07, this is the motion in limine? This is the motion in limine. That is correct. What did the district court do with this motion? With this motion in limine, they ordered that we were not allowed to bring up any evidence of functionality at the trial. By that time, the Matex case had already been decided and was not vacated. So that's not evidence? That's not evidence that was presented to the judge on summary judgment? It was not. The Matex case was not. Correct. But it had been decided... I'm a little confused that you did this motion in limine on functionality. The district court denied your motion. Denied? They did a motion in limine to prevent functionality from being discussed at trial. And then we opposed that motion and it was not decided in our favor. I mean, it was our position that at this point, the trade dress had been ruled dysfunctional or it was a finding that was found in the Matex case. And we believed at the time that that finding was correct. We still do. And for whatever reason, that case was not presented to the lower court. I'm just... I'm a little bit confused about your argument. Let me see. This is meant to be a helpful question. Are you trying to present this to us in response by pointing to Matex and then pointing to 3406 and 3407? Is this an attempt to demonstrate to us that this argument was not waived below? It was not waived below. Is that what this is for? That is what it is for. And it's also to demonstrate that at the time when these motions in limine and everything were going on, there was strong evidence that the trade dress was functional and therefore invalid. And it was not considered by the lower court and it should happen. So that's evidence that was not presented to the judge on summary judgment. Other than what we have in our reply, Your Honor. Isn't the question here whether the summary judgment is correct? It is correct, whether the summary judgment... And so the evidence that you were using that you found after the summary judgment, you were using to show that the summary judgment was incorrect. Is that what you're saying? Well, you can always appeal the summary judgment decision. And we believe that the summary judgment decision was incorrect because there were patents that had previously... But he didn't. So I realize that. But that wasn't... The judge didn't have that in front of him, did he? When he rendered the summary judgment motion. That is correct. But it is generally... It is generally the burden of the person who's putting forth the unregistered trade dress to show that it is non-functional. And... He had experts. He had testimony. He had a book of evidence saying why this is functional. Yes, but under case law, in order to determine whether something is non-functional, there are things that you have to take a look at. And one of those things that you have to look at is whether there are... I don't want to use up your time, but it's puzzling my mind that you're using evidence that wasn't in front of the judge on summary judgment to undermine a summary judgment ruling. It didn't happen like three years later, right? It did happen three years later. You're absolutely right, Your Honor. But we believe that it was not considered correctly by the lower court. OK, thank you, Ms. Jean. Mr. Cox, you have some rebuttal time. Thank you, Your Honor. I'd like to just... Four minutes. I'd like to just follow up on that trade dress argument regarding the summary judgment. We did list patents in our summary judgment briefs. We listed SHARP, which is located at Appendix 665. SHARP is a patent from the 19th century. It teaches three of the four elements of... This is on functionality, right? Yes, yes, Your Honor. You're now making a rebuttal argument on continuing the argument on behalf of your colleague. Yes, yes. I just want to briefly... I guess it's OK. I mean, mixing apples and oranges. Well, just where in the brief did you make this patent-centric functionality trade dress argument? In your brief. We made it in relation to the... Can you get me a page? In your brief where you did... Said what you're about to say now. Oh, hang on, Your Honor. You can't have it both ways. You can't separate up your arguments and then mix everything up again like it's a PIXMASTER. So where is it in your... In your... I'm looking at your blue brief signed by you. Oh, the brief... The corrected brief? I would hope the corrected brief.  The earlier brief was rejected, as I recall. Yes, Your Honor. It's at page 20. Page 20? Page 7, excuse me. Page 7. Page 7. And it is also... I'm looking at 7. No, I don't think it's page 7. I mean, you're talking about your blue brief? Yes, Your Honor. Blue brief. Page 7 doesn't have anything to do with functionality. Page 7 is your background section. Page 7 is just your discussion of background. What's your next page? Page 9. Page 9. And where on page 9? Third line. Third line? Slavic Romans? Page 9 we're looking at? I'm referring to the pagination, not the docket. It's page 22 for the... We're going by the... Were you correct on page 7, or would you like to go back to that and find a different page? I have no idea. I'm in a blue brief here. What page of the blue brief? I was looking at... What is the point you think you're trying to make so I can understand what you're trying to prove? I'm trying to prove, Your Honor, that there's four elements to their trade drafts. Three of those elements are found in the Sharpe patent. We want to know, where was it argued below to the district court? It was argued below to the district court in 12B6, motion to dismiss, which is docket 59. That's not in the appendix. And then it was also argued in our motion for summary judgment. Right. And the other side pointed to A2440. And that looks pretty flimsy. Now, your colleague also pointed to A2850-51. That's a reply brief. What are the chances this is going to settle? Low. Well, y'all are too. This case is a mess. All right, we're out of time. Case is over. Thank you, Your Honor.